# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| RODNEY A. WHITING, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| *versus* | § | CIVIL ACTION NO. 1:12-274 |
| | § | |
| MICHAEL J. ASTRUE, | § | |
| Commissioner of the Social | § | |
| Security Administration, | § | |
| | § | |
| *Defendant.* | § | |

## REPORT AND RECOMMENDATION

Plaintiff Rodney A. Whiting ("Whiting") brings this action under 42 U.S.C. § 405(g), seeking review of a decision denying his application for disability-based benefits under the Social Security Act. Complying with General Order # 18 (Dkt. No. 3), the parties join issues through competing briefs.[1]

## I. Background

Whiting's application claims that he became disabled as of March 4, 2008, due to: *low back, neck,* and *left ankle* impairments. (T.109-113, 130).[2] After being denied benefits initially (T. 60), Whiting requested a hearing before an administrative law judge ("ALJ"). (T. 67-69). ALJ Seymour Rayner ("ALJ

---

[1]    General Order #18 is dated September 23, 2003 (superseding January 24, 2002 and September 19, 2001 general orders). (Dkt. No. 3).

[2]    "T." followed by a number refers to the page of the administrative record. (Dkt. No. 10).

Rayner") conducted a video evidentiary hearing on August 5, 2010.[3] (T. 16, 27-59). ALJ Rayner received into evidence testimony from Whiting, forensic reports from state agency consultants and workers' compensation doctors, and Whiting's medical records. (T. 29).

On September 21, 2010, ALJ Rayner denied Whiting's application. (T. 16-22). Whiting appealed to the Appeals Council of the Social Security Administration's Office of Hearings and Appeals, which denied Whiting's request to review. (T. 1-4). This rendered ALJ Rayner's opinion the final decision. *See Sims v. Apfel*, 530 U.S. 103, 107 (2000).

Whiting timely instituted this case on February 13, 2012. (Dkt. No. 1). In this action, Whiting is represented by Thomas Erwin, Esq., who also represented Whiting at the administrative hearing. *Id.*

## II. Preliminary Discussion

An initial discussion of the Social Security program at issue, the administrative decision-making process (including certain terms of art) and the nature of judicial review will aid comprehension of Whiting's underlying claim, ALJ Rayner's decision, Whiting's challenges thereto and the undersigned's analysis.

### A.  *Eligibility for Benefits*

The Disability Insurance Benefits ("DIB") program provides income to *insured* individuals forced into involuntary, premature retirement by reason of *disability*. Applicants seeking benefits under this statutory provisions must prove *"inability to engage in any substantial gainful activity by reason of any*

---

[3]     ALJ Rayner presided over the hearing from Jericho, New York.  Whiting appeared and testified through interactive video in Albany, New York.  (T. 16).

*medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." See* 42 U.S.C. §§ 423(d)(1)(A)*,* 1382c(a)(3).

While straightforward and simple in concept, this eligibility standard is difficult to meet. Proof of a serious disease or impairment alone does not establish disability within the meaning of the Social Security Act. "The mere presence of a disease or impairment alone. . . is insufficient to establish disability; instead, it is the impact of the disease, and in particular any *limitations it may impose upon the claimant's ability to perform basic work functions*, that is pivotal to the disability inquiry." *Pavia v. Astrue*, No. 5:10–CV–818 (GTS/DEP), 2012 WL 4449859, at *8 (N.D.N.Y. Aug. 20, 2012) (citing *Rivera v. Harris*, 623 F.2d 212, 215-16 (2d Cir. 1980)) (italics added); *see also Carroll v. Secretary of Health & Human Servs.,* 705 F.2d 638, 642 (2d Cir. 1983); *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983).

This means that a showing of generalized disability is insufficient. Rather, a claimant must also prove inability to engage in *any* form of substantial gainful employment. This standard is so rigorous that one federal court of appeals has described it as "bordering on the unrealistic."[4] Thus, a person who might well be considered to be disabled in the ordinary sense of the word, may not be disabled within the specialized meaning of the Social Security Act.

B.    *Sequential Evaluation Procedure*

The law requires *individualized* determinations. *See Heckler v. Campbell*, 461 U.S. 458, 467 (1983). Hence, Commissioner Astrue generally must make both medical and vocational assessments in every case.

---

[4]    *See Oldham v. Schweiker,* 660 F.2d 1078, 1083 (5th Cir. 1981).

To accomplish this, the Commissioner utilizes a five-step evaluation procedure for adjudicating disability-based claims. *See* 20 C.F.R. § 404.1520(a).[5] This model is "sequential" in that when a decision can be made at an early step, remaining steps are not considered. *See id*. This evaluation process has judicial approval as a fair and just way for determining disability applications in conformity with the Social Security Act. *See Bowen v. Yuckert*, 482 U.S. 137, 153 (1987) (citing *Heckler*, 461 U.S. at 461) (use of the sequential evaluation process "contribute[s] to the uniformity and efficiency of disability determinations")).

1.   <u>Shifting Burdens</u>

*Claimants* must present evidence sufficient to produce favorable findings under the first four steps. *DeChirico v. Callahan*, 134 F.3d 1177, 1179-80 (2d Cir. 1998). When they successfully carry this burden, a *prima facie* case of

---

[5]       In this circuit, the Commissioner's five-step sequential procedure is described as follows:

1.       The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

2.       If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities.

3.       If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, claimant has an impairment [that meets or equals a] listed [impairment] in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.

4.       If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.

5.       If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Shaw v. Chater*, 221 F.3d 126, 132 (2d Cir. 2000) (citing *DeChirico v. Callahan*, 134 F.3d 1177, 1179-80 (2d Cir. 1998) (citing 20 C.F.R. §§ 404.1520, 416.920)).

disability is established. *See Mimms v. Heckler*, 750 F.2d 180, 185 (2d Cir. 1984). The burden then shifts to the *Commissioner* to show in Step 5 that "there is work in the national economy that the claimant can do." *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009); *see also DeChirico*, 134 F.3d at 1180; *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); 20 C.F.R. §§ 404.1566, 416.966.

2.  <u>Residual Functional Capacity</u>

Before making findings at Steps 4 and 5, an ALJ must first assess and articulate a claimant's "residual functional capacity" ("RFC"). This term refers to what claimants can still do in a work setting despite their physical and/or mental limitations caused by their impairments and any related symptoms, such as pain. *See* 20 C.F.R. § 404.1545; *see also Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (defining RFC). Administrative law judges thus decide whether applicants, notwithstanding their impairments, have physical and mental abilities to perform activities generally required by competitive, remunerative work on a regular and continuing basis. *See* SSR 96-8p, TITLE II AND XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, 61 Fed. Reg. 34474, 1996 WL 374184, at *4 (SSA July 2, 1996).

Commendably, the Commissioner provides detailed guidance for claims adjudicators in the form of both a formal regulation and an internal policy ruling. Collectively, these directives (a) identify various ordinary physical functions to be considered in context of an ordinary work schedule, (b) require function-by-function assessments of those activities, and (c) dictate that the ultimate RFC determination account for limitations imposed by both severe and non-severe impairments. *See* 20 C.F.R. §§ 404.1545(a)(2), 404.1545(b); SSR 96-8p, 1996 WL 374184, at **5, 7.

3.  Credibility Assessments

Claimants must present evidence (medical signs and laboratory findings) of an underlying condition that reasonably could be expected to produce the symptoms alleged. *See* 20 C.F.R. § 404.1529; SSR 96-7p, POLICY INTERPRETATION RULING TITLES II AND XVI: EVALUATION OF SYMPTOMS IN DISABILITY CLAIMS: ASSESSING THE CREDIBILITY OF AN INDIVIDUAL'S STATEMENTS, 1996 WL 374186, at *2 (SSA July 2, 1996). The best-informed (sometimes *only*) source of information regarding intensity, persistence and limiting effects of pain and other potentially disabling symptoms is the person who suffers therefrom. Testimony from claimants, therefore, is not only relevant, but desirable. On the other hand, a claimant's testimony is subjective, and may be colored by interest in obtaining a favorable outcome. Hence, subjective symptomatology by itself cannot be the basis for a finding of disability. *See* 20 C.F.R. §§ 404.1512(a), 404.1528(a).

The exclusive prerogative for making credibility assessments, *i.e.*, deciding how much weight to give to claimants' subjective self-evaluations, rests with an ALJ. *See Aponte v. Secretary, Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984) ("It is the function of the [Commissioner], not [the reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant."). Fortunately, the Commissioner provides explicit guidance in this area. First, a formally-promulgated regulation requires – once an impairment is identified – consideration of seven specific, *objective*

factors that naturally support or impugn *subjective* testimony of disabling pain and other symptoms.[6]

Second, SSR 96–7p directs ALJs to follow a two-step process to evaluate claimants' allegations of pain:

> First, the adjudicator must consider whether there is an underlying medically determinable physical or medical impairment (s) . . . that could reasonably be expected to produce the individual's pain or other symptoms . . . .

> Second, . . . the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities . . . .

SSR 96-7, 1996 WL 374186, at *2. The Ruling further provides that "whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record." *Id.*

Governing circuit law generally mirrors the Commissioner's Ruling. Thus, when an ALJ rejects a claimant's testimony of pain and limitations, he or she

---

[6] An ALJ must evaluate a claimant's symptoms based on the medical evidence and other evidence, including the following factors:

(i)   claimant's daily activities;
(ii)  location, duration frequency, and intensity of claimant's pain or other symptoms;
(iii) precipitating and aggravating factors;
(iv)  type, dosage, effectiveness, and side effects of any medication claimant takes or has taken to alleviate her pain or other symptoms;
(v)   treatment, other than medication, claimant receives or has received for relief of her pain or other symptoms;
(vi)  measures claimant uses or has used to relieve pain or other symptoms; and
(vii) other factors concerning claimant's functional limitations and restrictions due to pain or other symptoms.

*See* 20 C.F.R. § 404.1529(c)(3).

must provide explicit reasons for rejecting the testimony. *See Williams v. Bowen*, 859 F.2d 255, 260-61 (2d Cir. 1988); *Carroll*, 705 F.2d at 643; *Brandon v. Bowen*, 666 F. Supp. 604, 609 (S.D.N.Y. 1987).

### 4. Commissioner's Burden at Step 5

When sequential analysis proceeds beyond Step 4, the Commissioner usually undertakes to satisfy his Step 5 evidentiary burden by eliciting or consulting several sources of relevant evidence such as expert vocational testimony or officially-published data to show that a claimant can still do work existing in the national economy.[7] In limited circumstances, moreover, the Commissioner may take *administrative notice* of disability *vel non* by adopting and applying findings published in *"Medical-Vocational Guidelines,"* commonly called *"the grids." See Roma v. Astrue*, 468 Fed. App'x 16, 20-21 (2d Cir. 2012); *Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 2. When only *exertional* impairments[8] are in play, and an ALJ's findings of residual functional capacity, age, education, and previous work experience coincide with grids parameters, the Commissioner may directly apply

---

[7]    Generally, the Commissioner elicits or consults two principal sources of evidence relevant to whether claimants can perform alternative, available work. First, witnesses qualified as "Vocational Experts" may testify as to whether jobs exist for a person with the claimant's precise abilities. *See* 20 C.F.R. § 404.1566(e); *see also* SSR 00-4p, POLICY INTERPRETATION RULING: TITLES II AND XVI: USE OF VOCATIONAL EXPERT AND VOCATIONAL SPECIALIST EVIDENCE, AND OTHER RELIABLE OCCUPATIONAL INFORMATION IN DISABILITY DECISIONS, 2000 WL 1898704, at *1-2 (SSA Dec. 4, 2000). Second, a United States Department of Labor publication titled *Dictionary of Occupational Titles* ("DOT") can assist in determining when a claimant's residual work skills can be used in other work and the specific occupations in which they can be used. *See* 20 C.F.R. § 404.1560(d)(1); *see also* SSR 00-4p, 2000 WL 1898704, at *1-2.

[8]    "An exertional impairment is a limitation or restriction imposed by impairments and related symptoms, such as pain, that affect only a claimant's ability to meet . . . strength demands of jobs (*i.e.*, sitting, standing, walking, lifting, carrying, pushing, and pulling)." *Bogardus-Fry v. Astrue*, No. 7:11-CV-883 (MAD), 2012 WL 3779132, at *15 n. 14 (N.D.N.Y. Aug. 31, 2012) (citing 20 C.F.R. §§ 404.1569a(b), 416.969a(b); *Rodriguez v. Apfel*, No. 96 Civ. 8330(JGK), 1998 WL 150981, at *10, n. 12 (S.D.N.Y. Mar. 31, 1998)).

the grids to determine whether work exists in the national economy which claimants can perform. *See Martin v. Astrue,* 337 Fed. App'x 87, 91 (2d Cir. 2009); *Thompson v. Barnhart*, 75 Fed. App'x 842, 844 (2d Cir. 2003) (Commissioner can meet Step 5 burden "by resorting to the applicable medical-vocational guidelines (the grids)"); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 2.[9]

A grid rule cannot not apply when RFC findings do not coincide with all the grid criteria. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00. Since the grids do not take into account limiting or disabling effects of *nonexertional* impairments,[10] direct application of the grids to determine disability is not permitted. The Commissioner nonetheless permits administrative law judges to consult them as a "framework for consideration of how much the individual's work capability is further diminished in terms of any types of jobs that would be

---

[9] The grids are a matrix of general findings – established by rule – as to whether work exists in the national economy that a person can perform. "The grids take into account a claimant's RFC, as well as her age, education, and work experience." *Calabrese v. Astrue*, 358 Fed. App'x 274, 276 & n. 1 (2d Cir. 2009) (citing *Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir. 1999)). Ultimately, the grids yield a decision of "disabled" or "not disabled." *Zorilla v. Chater*, 915 F. Supp. 662, 667 & n. 2 (S.D.N.Y. 1996) (citing 20 C.F.R. § 404.1567(a)).

[10] "Nonexertional limitations" are "limitations and restrictions imposed by your impairment(s) and related symptoms, such as pain, affect[ing] only your ability to meet . . . demands of jobs other than . . . strength demands . . .." *See* 20 C.F.R. § 404.1569a(c)(1). Therefore, a nonexertional limitation is an impairment-caused limitation affecting such capacities as mental abilities, vision, hearing, speech, climbing, balancing, stooping, kneeling, crouching, crawling, reaching, handling, fingering, and feeling. Environmental restrictions are also considered to be nonexertional. SSR 96-9p, Determining Capability To Do Other Work, Implications of A Residual Functional Capacity for Less Than a Full Range of Sedentary Work, 61 Fed. Reg. 34478, 34481 (July 2, 1996).

contraindicated by . . . nonexertional limitations." 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(e)(2).[11]

Similarly, the grids do not factor limitations that preclude an individual from performing a *full range* of work at given exertional levels. In such instances, the Commissioner provides additional guidance through a Ruling that directs administrative judges to engage in an erosion-of-occupational-base analysis when a claimant's limitations prevent performance of a full range of even the least strenuous category of sedentary work. SSR 96–9p, DETERMINING CAPABILITY TO DO OTHER WORK, IMPLICATIONS OF A RESIDUAL FUNCTIONAL CAPACITY FOR LESS THAN A FULL RANGE OF SEDENTARY WORK, 61 Fed. Reg. 34478 (July 2, 1996). When such limitations only *slightly* erode the sedentary occupational base, the grids may still be applied directly. *Id*. at 34481. But, when limitations *significantly* erode the sedentary occupational base, it is appropriate to consult an extrinsic vocational resource to determine whether jobs exist in significant numbers that an individual may still be able to perform even with an eroded sedentary occupational base. *Id*. at 34483. In addition, when there is more than a slight impact on an individual's ability to perform a full range of sedentary work, but the administrative judge decides that the individual remains able to do other work, the administrative judge must cite examples of occupations or jobs the individual can do and provide a statement

---

[11]     Social Security Ruling 85-15 ("SSR 85-15") addresses this "framework" analysis, and directs that when evaluating nonexertional impairments, an administrative law judge should first consult the grids, along with consideration of the claimant's RFC and vocational factors, to determine the extent of impairment caused by *exertional* limitations. *See* SSR 85-15, THE MEDICAL-VOCATIONAL RULES AS A FRAMEWORK FOR EVALUATING SOLELY NONEXERTIONAL IMPAIRMENTS, 1985 WL 56857, at *3 (SSA 1985). The administrative judge should next determine how much that claimant's "occupational base," (the entire exertional span from sedentary work through heavy work), is *further reduced* by effects of *nonexertional* impairments.

of the incidence of such work in the region where the individual resides or in several regions of the country. *Id.* at 34481.

## C. *Judicial Review of Commissioner's Decision*

Judicial review of the Commissioner's denial of Social Security benefits is limited. The court's abbreviated role is to determine whether (a) the Commissioner applied proper legal standards and (b) the decision is supported by substantial evidence. *See Lamay v. Commissioner of Soc. Sec.*, 562. F.3d 503, 507 (2d Cir. 2009), *cert. denied*, ___U.S.___, 130 S. Ct. 1503 (2010); *Berry*, 675 F.2d at 467; *see also* 42 U.S.C. § 405(g). When proper principles of law were applied, and when the Commissioner's decision is supported by substantial evidence, the Commissioner's findings are conclusive and must be affirmed. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also* 42 U.S.C. § 405(g); *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004).

Under these constraints, reviewing courts cannot retry factual issues *de novo,* nor can they substitute their interpretations of administrative records for that of the Commissioner when the record contains substantial support for the ALJ's decision. *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998). Rather, in such circumstances, courts must defer to the Commissioner's resolution of conflicting evidence. *See Behling v. Commissioner of Soc. Sec.*, 369 Fed. App'x 292, 293 (2d Cir. 2010) (citing *Clark v. Commissioner*, 143 F.3d 115, 118 (2d Cir. 1998) ("[I]t is up to the agency, and not this court, to weigh the conflicting evidence in the record.")).[12] Hence, reviewing courts may not overturn the

---

[12] *See also Aponte v. Secretary, Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984) ("It is the function of the [Commissioner], not [the reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant."). "'[The Court] may only set aside a determination which is based upon legal error or not supported by substantial evidence.'" *Monette v. Astrue*, 269 Fed. App'x 109, 110-11 (2d Cir. 2008)(quoting *Berry*, 675 F.2d at 467); *see also* 42 U.S.C. § 405(g).

Commissioner's administrative rulings simply because they would have reached a different conclusion had the matter come before them in the first instance. *See Campbell v. Astrue*, 465 Fed. App'x 4, 5 (2d Cir. 2012).

1.   <u>Substantial Evidence</u>

"Substantial evidence" is a term of art.   It means less than a "preponderance" (usual standard in civil cases), but "more than a mere scintilla," and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *See Richardson*, 402 U.S. at 401; *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009); *Halloran*, 362 F.3d at 31.   Stated another way, to be "substantial" evidence need only be "enough to justify, if the trial were submitted to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." *National Labor Relations Bd. v. Columbian Enameling & Stamping Co.*, 306 U.S. 262, 299-300 (1939), *cited in* Harvey L. McCormick, Social Security Claims and Procedures § 672 (4th ed. 1991).

When conducting a substantial evidence review, a court's responsibility is "'to conduct a searching inquiry and to scrutinize the entire record, having in mind that the Social Security Act . . . is remedial in purpose.'" *Monette v. Astrue*, 269 Fed App'x 109, 110 (2d Cir. 2008) (quoting *McBrayer v. Secretary of Health & Human Servs.*, 712 F.2d 795, 798-99 (2d Cir. 1983)).   In this circuit, courts consider both objective and subjective factors: (1) objective medical facts; (2) diagnoses and opinions from treating and examining physicians; (3) subjective evidence of pain and disability, and any corroboration by family and neighbors; and (4) claimant's age, educational background, and work history. *Rivera v. Schweiker*, 717 F.2d 719, 723 (2d Cir. 1983).

## 2. Reviewing Credibility Choices

Administrative law judges (who usually have the only opportunity to observe witnesses' demeanor, candor, fairness, intelligence and manner of testifying) obviously are best-positioned to make accurate credibility determinations. *See Campbell*, 465 Fed. App'x at 5 (function of Commissioner, not the court, to appraise credibility); *see also Snell v. Apfel*, 177 F.3d 128, 135 (2d Cir. 1999) (stating that deference is given to ALJ's decision because he is in the best position to assess the claimant's credibility). Consequently, reviewing courts are loathe to second-guess and overturn credibility choices made by an administrative adjudicator.[13] Reviewing courts, however, cannot abdicate their statutory duty to determine whether correct principles of law were applied and whether challenged decisions are supported by substantial evidence. Consequently, even credibility choices are examined *ex post facto* in that limited context.[14]

---

[13] *See, e.g., Pietrunti v. Director, Office of Workers' Comp. Programs*, 119 F.3d 1035, 1042 (2d Cir. 1997) ("Credibility findings of an ALJ are entitled to great deference and therefore can be reversed only if they are 'patently unreasonable.'"); *Aponte*, 728 F.2d at 591 ("It is the function of the [Commissioner], not [the reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant."); *see also see also Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010) ("Normally, [the court] give[s] an ALJ's credibility determinations special deference because the ALJ is in the best position to see and hear the witness.").

[14] When an ALJ neglects to employ the proper legal standard, the court cannot subject his credibility determination to meaningful review. *See Meadors v. Astrue*, 370 Fed. App'x 179, 184-85 (2d Cir. 2010) (Because ALJ eschewed the two-step credibility inquiry required under 20 C.F.R. § 404.1529(c), remand required for a redetermination of claimant's RFC under the correct standard). Similarly, when an ALJ's credibility determination is based, in large part, on factual errors, the determination is not supported by substantial evidence and must be remanded. *See Horan v. Astrue*, 350 Fed. App'x 483, 485 (2d Cir. 2009) (ALJ's credibility determination based largely on factual errors not supported by substantial evidence); *Pratts v. Chater*, 94 F.3d 34, 37-38 (2d Cir. 1996) (substantial evidence did not support ALJ's decision when ALJ made several factual errors in evaluating medical evidence).

# III. The Commissioner's Decision

At Step 1, ALJ Rayner concluded that Whiting has not engaged in substantial gainful employment since March 4, 2008. (T. 18). At Step 2, he found that Whiting has severe impairments consisting of degenerative disc disease and arthritis.[15] (T. 18). At Step 3, he determined that none of these severe impairments meets or medically equals any of the listed impairments that are presumptively disabling. (T. 18-19).

ALJ Rayner next assessed Whiting's RFC as capacity to perform a full range of *light* work. (T. 19-21). Then, at Step 4, ALJ Rayner compared Whiting's RFC for light work with demands of his past work as a truck driver (as testified by Whiting[16]) and carpenter,[17] which required *medium* to *heavy* exertional effort. Thus, he determined that Whiting is unable to perform past relevant work. (T. 21).

This finding meant that Whiting carried his burden to prove a *prima facie* case of disability. The burden then shifted to the Commissioner to show at Step 5 that Whiting can perform alternative work existing in the national economy. ALJ Rayner elected to use the grids to satisfy this burden. After considering Whiting's RFC, age, education, and work experience in conjunction with Medical-Vocational Rule 202.21, he concluded that a finding of not disabled is

---

[15] Arthritis may have been listed inadvertently. Whiting does not claim disability due to arthritis; ALJ Rayner nowhere discusses it in his decision; and there is no reference to arthritis in Whiting's medical records.

[16] Whiting discussed his work history and the very basics of what each job entailed. (T. 31-33).

[17] Whiting work history consists of truck driving. There is no reference to being a carpenter in the record.

directed by Medical-Vocational Rule 202.21, and he denied Whiting's claim.[18] (T. 21).

The pivotal finding for purposes of this appeal is ALJ Rayner's RFC determination that Whiting retains capacity to perform a *full range* of light work.

## IV.  Points of Alleged Error

Whiting proffers two alleged errors:

1.  The Commissioner Erred in Assessing the Claimant's Residual Functional Capacity to be a Full Range of Light Duty Work; and

2.  The Commissioner Erred in Finding that the Claimant was "Not Disabled" at Step Five in the Sequential Analysis Utilizing the Medical-Vocational Rules.

As argued, the first point is an evidentiary challenge. The second point asserts legal-error.

Whiting argues, first, that credible evidence unequivocally establishes that he has physical limitations that prevent him from performing a *full range* of work at *any* exertional level. Specifically, Whiting contends that uncontroverted evidence establishes that these limitation require that he shift positions frequently, and that he not engage in work (a) involving prolonged sitting, standing or walking, (b) using foot controls or (c) overhead reaching. Since a full range of light or even sedentary work involves these activities, Whiting contends that a "full and fair determination regarding the claimant's residual functional capacity shows that the claimant does not retain the RFC to perform a full range of work at any exertional level." (Dkt. No. 12, pp. 11-13). Therefore, substantial evidence does not support ALJ Rayner's finding that Whiting retains capacity to perform a full range of light work. *Id.*

---

[18]     ALJ Rayner's complete findings and conclusions appear on four pages, 18-21, of the administrative transcript contained in the record before the court. (Dkt. No. 10).

Whiting argues in his second point that direct application of the grids to determine his non-disability constituted a failure to apply correct principles of law. Whiting argues that the grids can be applied in the manner done by ALJ Rayner only when Whiting's RFC coincides with the grids parameters. (Dkt. No. 12, pp. 13-14). Because Whiting's RFC, assessed properly, is for a limited range of work, direct application of the grids was a legal error. *Id.*

The Commissioner responds that substantial evidence generally supports ALJ Rayner's decision denying benefits. (Dkt. No. 14, pp. 9-14). The Commissioner asserts that ALJ Rayner properly assessed Whiting's credibility and that his RFC assessment is supported by the evidence of record. *Id.*, at pp. 9-13. The Commissioner also contends that ALJ Rayner's reliance upon the Medical-Vocational Guidelines was proper; the Guidelines show there is work in the national economy that Whiting can perform; thus, the ALJ Rayner properly found Whiting was "not disabled." *Id.*, at pp. 13-14.

## V. Analysis

Although Whiting's two points of error are distinct analytically, they are so entwined that they must be considered concurrently. If ALJ Rayner's RFC determination (capacity to perform *full range* of light work) is unsupported by substantial evidence (because evidence compels finding that Whiting's RFC is restricted to a *limited range* of exertional work), it necessarily follows that direct application of the grids, unaccompanied by either a "framework" or "erosion-of-occupational-base" analysis, likely constituted failure to apply correct principles of law. Conversely, if ALJ Rayner's RFC determination was not so flawed, ALJ Rayner committed no legal error in applying the grids directly. The whole case, therefore, hinges on whether Whiting's first point has merit.

Regulatory definitions of light and sedentary work are provided in the note below.[19] Given these definitions, Whiting surely is correct in arguing that a RFC finding of capacity to perform a full range of light work is fatally flawed if, as Whiting contends, uncontroverted evidence unequivocally establishes that his impairments involve limitations precluding him from prolonged sitting, standing, walking, using foot controls and overhead reaching.

Whiting also correctly asserts that ALJ Rayner could have found such limitations. For example, Whiting testified at the hearing that he suffers with daily pain in his neck and back, and symptoms radiate into his lower extremities, making it difficult to walk any distance over one block. (T. 39-41, 55). He further testified that if he stands more than five to ten minutes he loses feeling in his feet, and back pain is unbearable. (T. 41-42, 55-56). Whiting stated that he must spend time changing positions to try and alleviate pain. (T. 39, 42). He claims he has trouble negotiating stairs due to his back pain and

---

[19]     (a) Sedentary work. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

    (b) Light work. Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(a)-(b).

numbness in his feet. (T. 42-43). He asserted that he loses feeling in his hands with overhead work. (T. 40, 42).

Objective medical evidence clearly confirms that Whiting does have impairments that reasonably could cause these subjective symptoms:

- A radiological magnetic resonance imaging ("MRI") in March 2008 showed degenerative changes from L3 to S1 with a disc extrusion on the left at L5-S1, spinal stenosis at L4-5, and narrowing of the neuro foramen at L3-4.[20] (T. 212).

- Another MRI taken in August 2008 revealed a mild intervertebral disc bulge at L3-4, a disc herniation at L4-5 resulting in mild mass effect on the ventral thecal sac, and a disc herniation at L5-S1 mildly posteriorly displacing the S1 nerve root. (T. 220-21).

- Dr. Thomas McCormack, M.D., a neurosurgeon and Whiting's treating physician, recorded Whiting's subjective reports of severe back and neck pain, restricted range of neck and lumbosacral movement and constant leg pain with a left foot drop. Dr. McCormack observed a positive straight leg raising test bilaterally. (T. 201-206, 212, 218).

- A Functional Capacity Report prepared on September 29, 2008, by physical therapist, Michele L'Hommedieu, indicated that Whiting can perform light work with the option to change positions as needed. (T. 227).

- In November 2008, Dr. McCormack noted in a questionnaire from the State of New York, that Whiting is unable to sit for very long periods of time. (T. 235).

- A consultative, internal medicine examination performed in August 2009, by Dr. Kautilya Puri, M.D., noted that Whiting has mild limitations to overhead reaching secondary to his history. (T. 313).

- In February 2010, Dr. Charles Totero, M.D., an orthopedic surgeon, performed an independent medical examination in connection with a separate workers' compensation proceeding, and noted a temporary marked partial disability, apportioning 60% to his post-surgical cervical spine condition and 40% to lower back condition. (T. 333).

---

[20]    The record citation referenced (T. 212) is not to the radiologist's impression of the MRI; instead, it is to Dr. McCormack's office notes that summarize the MRI. (T. 212).

Given the limited nature of judicial review, however, the determinative question is not whether ALJ Rayner *could* have found that Whiting has RFC for only a limited range of work, but, rather, whether uncontroverted and overwhelming evidence *compelled* him to make such a finding.

Such is not the case. First, Whiting's own testimony regarding his daily activities gave ALJ Rayner cause to question whether Whiting's statements about intensity, persistence and functionally limiting effects of pain and other symptoms are fully credible. Whiting testified that he lives in a two-story house with his girlfriend and 16-year old son. (T. 42). He dusts, washes dishes, does laundry, and sweeps. (T. 44-45, 48). He goes car camping with his family, sleeping in a pop-up camper.[21] (T. 45). He drives and rides in a car. (T. 45). He walks his dog outside (T. 40-41), socializes with friends (T. 49), can shower, groom and dress himself, and drive himself to the bank and doctor appointments. (T. 47-48, 51). Whiting stated he likes to read and watch television. (T. 53-54). He uses a computer and can lift a gallon of milk. (T.53, 56). These activities involve many of the same physical functions that his brief to the court argues that he cannot perform in a work setting.

Second, objective medical evidence does not overwhelmingly and unequivocally support Whiting's forensic premise that he has both exertional and nonexertional limitations that prevent him from performing a full range of light work. For example, while there are some references to occasional, mild or "patchy" sensory loss or numbness in Whiting's left extremity, no treating, examining or consulting physician opined that Whiting lacks capacity to use foot controls. Rather, treating physician Dr. McCormack specifically stated that

---

[21] On June 1, 2010, treatment notes in the gastroenterology clinic of the Veteran's Affairs Medical Clinic ("VAMC") indicate that Whiting forgot to take his medication for gastritis while on a Memorial Day camping trip and began experiencing chest pain. (T. 363).

Whiting "certainly would be capable of driving a car or light truck and being a supervisor." (T. 306). An X-ray of Whiting's left ankle was "unremarkable," with "no acute fracture or dislocation demonstrated." (T. 286). In June 2010, he reported his neck pain had improved, but complained of numbness and tingling in his hands at different times as well as feeling a sense of "instability." (T. 379). Upon examination, however, he was not unstable. *Id*. In similar vein, while there are oblique and relatively few mentions of limitations in sitting, standing or walking for prolonged periods of time, there is affirmative evidence that Whiting can tolerate "up to 20 minutes of aerobic activity in our gym as well as stabilization exercises with no complaint." (T. 214). Additionally, Whiting exercises on a treadmill and has been prescribed a Wellness Program. (T. 383).

Radiologic evidence, while consistently confirming presence of lumbar disc disease and cervical disc disease, does not reflect a degree of severity likely to generate significant functional limitations. A lumbar spine MRI taken on June 21, 2010, revealed only *minimal* posterior disc protrusion at L4-5 and L5-S1 *without* neural impingement, with *no* spinal stenosis. (T. 387). This was an improvement from previous studies. (T. 387, 309-10). And, in April 2010 after Whiting's cervical discectomy, Dr. McCormack reported that Whiting "has a reasonably full range of motion in the neck." (T. 383). These findings do not suggest spinal limitations beyond anything that will be accommodated by restrictions to the typical requirements of light work.

Finally, additional findings and opinions from the same and other medical sources reflect no compelling basis for a RFC determination with limitations advocated by Whiting:

- In August 2009, consultative examiner, Dr. Puri, reported that Whiting did not have *any* objective limitations to communication, fine or gross motor activities, his gait, or his activities of daily living. (T. 313). Dr. Puri observed Whiting's gait to be *normal*, and he could walk on heels and toes *without difficulty*. (T. 312). Whiting's squat was reported as

*full*, his stance was *normal*, and he used no assistive devices to walk. (T. 312). He did not need help changing for the examination or getting on and off the examination table, and could rise from a chair without difficulty. *Id.* Dr. Puri assessed that Whiting had only *mild* limitations in overhead reaching, and observed that he had *full range of motion* of his shoulders, with *full (5/5) strength*. (T. 313).

- In March 2010, Dr. McCormack noted that Whiting demonstrated *much improved* range of motion of the cervical spine. (T. 338).

- In a follow-up office visit to Dr. McCormack on June 9, 2010, Whiting demonstrated "good motor function in the lower extremities" with some restrictions in range of motion. (T. 379).

- On April 21, 2010, independent medical examiner (for purposes of Workers' Compensation), Dr. Barry Katzman, M.D., a board certified orthopedic surgeon, observed some limits in Whiting's cervical spine, but that Whiting had a *normal* range of motion in his lumbar spine and *no* observed problems with his gait. (T. 399-400).

- Dr. Katzman assessed that Whiting had "no disability in regards to his back." (T. 400).

- Dr. Katzman, noted that Tinel's and Carpal Compression Test were positive, but Whiting had *full (5/5) strength* and *symmetrical reflexes* in both of his arms. (T. 399).

- In October 2009, Dr. Junnong Tang, M.D., summarized electromyogram ("EMG") and nerve conduction test results that noted *mild* median neuropathy at the left wrist (carpal tunnel syndrome), but otherwise were *normal*. (T. 330). There was *no evidence* of right median neuropathy at his right wrist. *Id.* There were *no signs* in his hands of muscle atrophy and strength was *normal*. (T. 328). No evidence of bilateral cervical radiculopathy. *Id.* He observed that bilateral shoulder range of motion was *within functional limits*. *Id.* He noted that there were *no shoulder impingement* signs. *Id.* Whiting's shoulder abduction and forward flexion strength were *normal*. *Id.*

- In July 2009, Dr. McCormack documented good motor and sensory function. (T. 297).

- In April 2010, Dr. McCormack noted again he had good motor function and "maybe" a "patchy sensory loss in his arms, *but nothing major*." (T. 383) (emphasis added).

Because Whiting's subjective statements about intensity, persistence or functionally limiting effects of pain or other symptoms were not substantiated

by objective medical evidence, ALJ Rayner was bound to make a finding on Whiting's credibility based on consideration of the *entire case record*. *See* Section II.*B*.3, *supra*. Taking the entire case record into consideration, substantial evidence of record supports ALJ Rayner's conclusions.

Whiting's first point of error, therefore, fails, and with it falls the second point of error. Since there was no substantial evidence error in ALJ Rayner's RFC determination, he did not err in applying the grids directly to determine whether Whiting is disabled.

## VI. Credibility Assessment

ALJ Rayner expressly summarized the relevant evidence addressing Whiting's complaints of pain and other subjective complaints. (T. 19-21). Thereafter, he concluded:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, *the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.*

(T. 19) (emphasis added). Although not raised in Whiting's brief, there is an implicit suggestion that ALJ Rayner fundamentally erred when rejecting Whiting's subjective testimony as being not fully credible. In the interest of giving full consideration to Whiting's request for judicial review, the court should, therefore, examine this embedded or latent argument.

Correct principles of law governing administrative credibility choices and judicial review thereof were set forth in Section II.*B*.3. and *C*., above. When assessing Whiting's credibility, ALJ Rayner cited the applicable Regulations and Rulings (T. 19-21)thus indicating his awareness of and intent to follow them. Specifically, when assessing credibility, he considered the seven specific objective factors identified in the Regulation to the extent there was evidence thereof,

engaged in the two-step process as required by the applicable Ruling, and provided explicit reasons for finding Whiting's subjective complaints not fully credible, as required by circuit law. (T. 19-21).

Consequently, ALJ Rayner's decision reflects no structural or legal error in his credibility determination. And, as determined above in Section V., substantial evidence supports that determination. There is no basis, therefore, to reverse the Commissioner's decision for a legally-flawed credibility choice.

## VII.   Recommendation

The Commissioner's decision denying disability-based benefits should be **AFFIRMED**.

## VIII.   Objections

Parties have fourteen (14) days to file specific, written objections to the Report and Recommendation. Such objections shall be filed with the Clerk of the Court.

**FAILURE TO OBJECT TO THE REPORT, OR TO REQUEST AN EXTENSION OF TIME TO FILE OBJECTIONS, WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**

*Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Graham v. City of New York*, 443 Fed. App'x 657, 658 (2d Cir. 2011); *FDIC v. Hillcrest Assocs.*, 66 F.3d 566, 569 (2d Cir. 1995); *see also* 28 U.S.C. § 636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, and NDNY Local Rule 72.1(c).

Signed on the ___15___ day of ___January___ 2013.

*Earl S. Hines*

Earl S. Hines
United States Magistrate Judge